Joseph L. Caven and Joseph R. Tindall, Executors of the last Will and Testament of Margaret F. Erwin, and Dr. Lewis H. Adler, Mary Frances Cole, Ellen C. Moore, Augusta Lee, Julia Roesch, Alonzo .W. Parsons, Elizabeth C. Hollingsworth, William Poole, Joseph Poole, Mary Hoppin, The Protestant Episcopal Church of St. James The Less, Grace Protestant Episcopal Church Chapel, St. Thomas African Protestant Episcopal Church, The Protestant Episcopal Hospital, *v.* Mary Irwin Agnew, Appellant.

*Devisavit vel non—Burden of proof—Confidential relation.*

While the law is plain that whenever one holding a confidential relation to a testator writes or procures to be written for him a will, and thereunder takes a substantial benefit, and the faculties of the said testator are at the time of making the will impaired, although not to the point of destruction of testamentary capacity, there is a presumption that undue influence has been brought to bear on the testator, and the burden lies on the beneficiary

to rebut the presumption and to show that the transaction was fair and conscientious and beyond the reach of suspicion, yet when, in an issue devisavit vel non, a jury has been instructed to the foregoing effect, and there is conflicting testimony, so that the decision of the questions of good faith on the part of the beneficiary and the existence of undue influence must rest upon inferences to be drawn from facts, a court does not err in submitting the questions to the jury as being within its peculiar province.

Argued March 21, 1898. Appeal, No. 196, Jan. T., 1897, by defendant, from judgment of C. P. No. 2, Phila. Co., March T., 1895, No. 665, on verdict for plaintiffs. Before STERRETT, C. J., GREEN, WILLIAMS, DEAN and FELL, JJ. Affirmed.

Issue devisavit vel non. Before PENNYPACKER, P. J.

The facts appear by the opinion of the Supreme Court and the charge of the court below which was as follows:

Margaret F. Erwin, upon October 30, 1893, executed a will in which she disposed of property amounting to about $206,000. She was a maiden lady living at 1835 Arch street, with three colored servants, and otherwise alone. She was eighty-nine years of age. She had had an attack of grippe or bronchitis in the winter of 1892, and another attack in the spring of 1893, which to a certain extent affected her vision, and according to the testimony of some of the witnesses her face was drawn. She had had a fall at one time in the night. She had a dizzy spell in the fall of 1893, and at the time of the execution of this will she was suffering from the pain in her toe which subsequently resulted in gangrene, from which she died on January 1, 1894. That will is contested, and there are two issues which are presented for your determination. . . . It is suggested by the contestants in the first issue that she was not of testamentary capacity, that she was not of sound disposing mind, memory, and understanding, and in the second issue, that this will was the result of undue influence. . . . But I will relieve you from all trouble with respect to this first issue. [I have examined all of this testimony with considerable care, and I find nothing in it which would justify you in determining that this testatrix here had not testamentary capacity. My instruction to you, therefore, is, upon the first of these issues, to find for the plaintiffs.] [7] The real question which is raised in this case is upon the second issue, as to whether or not this will

which is in controversy was really the will of the testatrix, Miss Margaret F. Erwin, or whether or not it was brought about by undue influence exerted by others. . . .

It appears that in August, 1892, this testatrix had made another will. Under the terms of that will some $66,000 in all were given to her servants, and the residuary part of her property was given to the contestant here, Mrs. Agnew. The bulk of her property was in the residuary devise and bequest. Under this will which is in dispute, that of October 30, 1893, some $27,000 in all is given to her counsel, Mr. Tindall, $86,000 to the servants, and the balance of her property, left after making some devises and bequests, goes to charities, and Mrs. Agnew is left out of that will entirely. As you see, therefore, there was a fundamental change in the disposition which she made of her property between the times of the execution of those two wills. . . .

It appears in this case that Mr. Tindall, who is one of the beneficiaries, occupied a confidential relation to the testatrix. He had entire charge of her property. He was her counsel. It appears that in the lifetime of her nephew this testatrix had depended upon that nephew absolutely for all advice, and that on his death Mr. Tindall took his place; that she could not, as she expressed it, do without him; she did not know how she could get along without the assistance of Mr. Tindall. He not only was her confidential adviser, but he took the position of a friend. The evidence is that almost daily he went there to see her, talked to her about the ordinary affairs of life, and that she looked forward to his visits. When she gave him some peaches he told her that they were the best he had ever eaten in his life. This confidence which was displayed by the testatrix had its manifestations in very substantial ways. In the first place, he got a commission upon the moneys of hers which he collected; he got a fee of $2,000 for the services which he, in conjunction with Mr. Johnson, gave in the equity suit, for which Mr. Johnson's compensation was $500. He got a commission of five per cent upon the bulk of the two estates amounting to $310,000, so that his commission was the comfortable sum of $15,500, and in addition to these compensations there were certain gifts from the testatrix. In January, 1893, he received $1,000; in May, 1893, he received $3,500; in August,

1893, she sent him to the fair, which cost $225, and that was followed by the presentation of a mortgage of $12,000. Now, I think it must be said, and it is rather painful to say it, but still the exigencies of the case require it, that I do not think you can read or consider carefully his testimony without reaching the conclusion that this confidence which was so implicitly placed by the testatrix in Mr. Tindall was mistaken. It appears, to begin with, that when he took from her receipts for these moneys which had been given to him by the testatrix he drafted the receipts himself, and he described the moneys not as gifts, which they were, but as moneys intended for a special purpose or for a particular purpose. He testifies that when the agent sent the check to him for the Bail and Tioga rents, a check drawn to the order of Mrs. Agnew, he sent that check to Mrs. Agnew and that he said nothing at all to Miss Erwin about it. Now he was the agent of Miss Erwin, and it was his duty to see that she knew that the rents which belonged to her were paid, and were given to her. The $15,500 of which I have spoken was, as he tells us, represented to Mrs. Agnew as compensation for his services with respect to those estates, and he says that he told Mrs. Agnew that Miss Erwin had paid the whole amount of it, but with respect to Miss Erwin it was a gift. It appears also that of the $22,500 which Mrs. Agnew gave him, representing the interest of Miss Erwin in the real estate, he expended some $8,000 or $10,000 for his own purposes, without consultation, and without the knowledge of Miss Erwin at the time. He says that she subsequently approved of it, but when he spent it, the ascertaining of this large sum, which was a gift, and only a gift from the point of view of Miss Erwin, had not been made. He also, as he testifies, when the will of Miss Erwin, the earlier will of 1891, had been intrusted to him as counsel, exhibited it to one who was an entire stranger, Mr. Stevenson. Now you heard Mr. Caven testify as to what he regarded as the duty of counsel under those circumstances. The drafts of wills made by him, after the will had been executed, were destroyed in the exceeding care which he manifested that the secrets of his client intrusted to him should not get into the hands of strangers, but we have Mr. Tindall exhibiting to a stranger that will which had been given to him in confidence, and also the will of 1892, because Mr. Ste-

venson tells us that he knew the contents of that will, and had seen it, contrary to the duty which Mr Tindall owed to the interests of his client intrusted to him.

Now her gratitude for which she had made this bounteous acknowledgment to him was, as he tells us, largely because of the fact that she thought if it had not been for Mr. Tindall she would have been penniless, and that was because Mr. Tindall had suggested to Dr. Erwin Agnew to make a codicil to his will leaving her part of the estate to her. It appears that that advice was imperfect and incorrect advice. It did not, in the first place, accord with the facts. That property did not belong to Dr. Erwin Agnew, and he could not give it. He held it in trust, and when the matter was presented to other counsel, this provision of the will for which Miss Erwin was so grateful was not carried into effect, and a bill in equity in accordance with what was the exact fact, that Dr. Erwin Agnew was a trustee, was drawn by Mr. Johnson. And it appears that the saving of $10,000 from this bequest which was introduced into the will by Mr. Tindall was also impressed upon this good lady as a matter requiring her acknowledgment. I think, therefore, as I said to you, that it must appear to you that the confidence which was placed in the agent was not justified by the facts.

But we are not so much confronted with the previous relations as we are with the question as to whether or not Mr. Tindall, at the time of the execution of this will, exercised upon Miss Erwin any undue influence. That, as you see, is an inquiry into the condition of Miss Erwin's mind, and it involves your investigation of the conduct, not so much of those who had other relations to her, but the conduct of those who surrounded her at the time, and who are alleged to have used this influence. It is a difficult inquiry, because it does involve knowing the mind of another person, but that is the task which is set before you. You must endeavor to look into the secrets of Miss Erwin's mind, and see whether or not this will represented her purposes and intentions, or whether it represented the purposes of other persons.

Now, to begin with, in looking at Miss Erwin you have what I regard as an important fact at the outset. Before any of these wills were made, in the lifetime of Dr. Agnew, Miss Er-

1893, she sent him to the fair, which cost $225, and that was followed by the presentation of a mortgage of $12,000. Now, I think it must be said, and it is rather painful to say it, but still the exigencies of the case require it, that I do not think you can read or consider carefully his testimony without reaching the conclusion that this confidence which was so implicitly placed by the testatrix in Mr. Tindall was mistaken. It appears, to begin with, that when he took from her receipts for these moneys which had been given to him by the testatrix he drafted the receipts himself, and he described the moneys not as gifts, which they were, but as moneys intended for a special purpose or for a particular purpose. He testifies that when the agent sent the check to him for the Bail and Tioga rents, a check drawn to the order of Mrs. Agnew, he sent that check to Mrs. Agnew and that he said nothing at all to Miss Erwin about it. Now he was the agent of Miss Erwin, and it was his duty to see that she knew that the rents which belonged to her were paid, and were given to her. The $15,500 of which I have spoken was, as he tells us, represented to Mrs. Agnew as compensation for his services with respect to those estates, and he says that he told Mrs. Agnew that Miss Erwin had paid the whole amount of it, but with respect to Miss Erwin it was a gift. It appears also that of the $22,500 which Mrs. Agnew gave him, representing the interest of Miss Erwin in the real estate, he expended some $8,000 or $10,000 for his own purposes, without consultation, and without the knowledge of Miss Erwin at the time. He says that she subsequently approved of it, but when he spent it, the ascertaining of this large sum, which was a gift, and only a gift from the point of view of Miss Erwin, had not been made. He also, as he testifies, when the will of Miss Erwin, the earlier will of 1891, had been intrusted to him as counsel, exhibited it to one who was an entire stranger, Mr. Stevenson. Now you heard Mr. Caven testify as to what he regarded as the duty of counsel under those circumstances. The drafts of wills made by him, after the will had been executed, were destroyed in the exceeding care which he manifested that the secrets of his client intrusted to him should not get into the hands of strangers, but we have Mr. Tindall exhibiting to a stranger that will which had been given to him in confidence, and also the will of 1892, because Mr. Ste-

venson tells us that he knew the contents of that will, and had
seen it, contrary to the duty which Mr Tindall owed to the in-
terests of his client intrusted to him.

Now her gratitude for which she had made this bounteous
acknowledgment to him was, as he tells us, largely because of
the fact that she thought if it had not been for Mr. Tindall
she would have been penniless, and that was because Mr. Tin-
dall had suggested to Dr. Erwin Agnew to make a codicil to
his will leaving her part of the estate to her. It appears that
that advice was imperfect and incorrect advice. It did not, in
the first place, accord with the facts. That property did not
belong to Dr. Erwin Agnew, and he could not give it. He
held it in trust, and when the matter was presented to other
counsel, this provision of the will for which Miss Erwin was so
grateful was not carried into effect, and a bill in equity in
accordance with what was the exact fact, that Dr. Erwin Ag-
new was a trustee, was drawn by Mr. Johnson. And it appears
that the saving of $10,000 from this bequest which was intro-
duced into the will by Mr. Tindall was also impressed upon
this good lady as a matter requiring her acknowledgment. I
think, therefore, as I said to you, that it must appear to you
that the confidence which was placed in the agent was not jus-
tified by the facts.

But we are not so much confronted with the previous rela-
tions as we are with the question as to whether or not Mr. Tin-
dall, at the time of the execution of this will, exercised upon
Miss Erwin any undue influence. That, as you see, is an in-
quiry into the condition of Miss Erwin's mind, and it involves
your investigation of the conduct, not so much of those who
had other relations to her, but the conduct of those who sur-
rounded her at the time, and who are alleged to have used this
influence. It is a difficult inquiry, because it does involve
knowing the mind of another person, but that is the task which
is set before you. You must endeavor to look into the secrets
of Miss Erwin's mind, and see whether or not this will repre-
sented her purposes and intentions, or whether it represented
the purposes of other persons.

Now, to begin with, in looking at Miss Erwin you have what
I regard as an important fact at the outset. Before any of
these wills were made, in the lifetime of Dr. Agnew, Miss Er-

win had transferred all of her property, real and personal, to her nephew, Dr. Agnew, and apparently had not a scratch of a pen to show that she was the owner of it. Undoubtedly the affection between aunt and nephew may be very strong, between mother and son and father and son, and near relatives, but it is certainly a very unusual fact that an estate amounting, as we have heard, to more than $200,000 is transferred to another, even one occupying such close and intimate relations, and it indicates something of the mental makeup of this lady about whom we are inquiring. Now there have been witnesses through the case, a number of them, who have testified that Miss Erwin was not the kind of a woman who would be likely to be influenced. That, however, was not the opinion of Mr. Tindall, and he was close to her, and her adviser. That appears in this way: He tells us that when the will of 1891 was made the suggestion first came from the people downstairs in the room below. Somebody suggested that Miss Erwin ought to make a will; that then they went upstairs, and either he or Mrs. Agnew suggested to her that she ought to make a will, and that thereupon he sat down and wrote it. There is a certain plausibility, although it is contradicted by a number of other witnesses who were present, about this account of it which is given by Mr. Tindall. It would certainly be remarkable if Miss Erwin, with her dead nephew lying in the adjoining room, and about to have an autopsy performed upon him, should want at that time to make a disposition of her property, and we are told that when she started to make her will the suggestion as to the girls was, " Will you give them $20,000, $30,000 ? " So that other persons were suggesting the amounts to her, and this testimony, if it be correct, indicates a woman who, under that great sorrow, with her nephew lying dead, about her own property apparently had at that time not force enough to resist the efforts of those about her who were anxious that there should be some disposition made of what she had. Further than that, we have the evidence of Mr. Tindall that he actually did influence her in making a will. His testimony with respect to the will of 1892 is that she wanted to draft a new will, and she gave him some directions, but that as to the bulk of it, the residuary bequest, which covered the greater part of the property, that he put Mrs. Agnew's name in for the residuary

estate without consulting Miss Erwin: "She gave me no special instructions about the residuary estate." He drafted the will leaving the residuary estate to Mrs. Agnew, and he took it up to Miss Erwin and she read it, and this is what she said: "I see Mary gets the balance of the property; I don't see what claim she has upon my estate." That is, Miss Erwin was objecting to the residuary clause which her counsel had put in her will without asking her. Then Mr. Tindall says: "I remarked, 'She expects it, Miss Erwin.'" That is, he undertook to determine the question, and then the will was executed. And on cross-examination he testified: "I had no motive in leaving her out." Not that Miss Erwin was determining the question, but that counsel with respect to the bulk of this estate had no motive for leaving her out.

Now when we come to the will in dispute, that of October 30, 1893, which was prepared by Mr. Caven and executed, it appears that before the will was executed Mr. Tindall had been with her and had gone over the items of the will. They were put down upon a piece of paper, and that he suggested that Mr. Caven draw it, and that Mr. Caven should be the executor. He says about Miss Erwin, that she had at that time evidently made up her mind, so that at the time when the amounts to be given and the points to be determined were ascertained she was consulting with Mr. Tindall, and that what Mr. Caven did later was to put the paper into formal shape. It also appears that this paper which Mr. Tindall had gone over was copied by Fanny. Her testimony is that she copied the paper which was presented. I have listened to the testimony of Fanny and the testimony of Mr. Tindall, in an effort to ascertain why it was necessary that Fanny should make a copy of that paper. To be sure, Miss Erwin had a great deal of confidence in her, but she also had confidence in Mr. Tindall, and she surely could not have thought that Mr. Tindall either did not write so good a hand, because he wrote a conveyancer's hand, or that he did not know how to draft the terms in an instrument like that. That it was intended temporarily at the time to be complete is shown by the fact that that memorandum copied by Fanny she signed, the purpose evidently being that it should be a complete instrument in the event of anything happening before she could execute a more formal will. Now what was the purpose in

having Fanny copy it? There were three persons who knew that Fanny had copied it—Mr. Tindall, Fanny herself, and Miss Erwin—and that fact, it appears, Mr. Caven did not know. If the purpose was that Mr. Caven should not know that Mr. Tindall had consulted with his client at the time, that the question was really under discussion, then we can understand a reason for it. If there be any other reason, if it was not with a view of concealment, then you will consider it carefully and find out what that reason was.

Did Fanny exert any undue influence? Mr. Tindall says that at the time he left that memorandum with Miss Erwin her mind was made up; that she had evidently thought over it carefully, and her mind was made up. Upon that memorandum Fanny had been given the sum of $30,000. After the memorandum had been copied Fanny, under the will of October 30, gets $40,000, and Fanny herself testifies to you that Miss Erwin was willing and wanting to give her $50,000, but she objected to it. Meanwhile, since the time when Miss Erwin's mind had been made up, so far as we can see, nothing had occurred except that Fanny had copied the memorandum of the will. Now here was a very considerable change in the disposition which she made. It also appears, and that impresses me as somewhat remarkable, that when we come to the residuary bequests, the disposition of what is left after the special bequests in this will, one of the residuary legatees is the church with which Fanny was connected. Miss Erwin had bountifully provided for her servants, and one would naturally suppose that in looking about for charities, the many hospitals and the many churches with which she had association, Christ Church in which her grandfather was buried, would occur to her mind as proper ones to which to leave a bequest of that character. It appears, according to the testimony of Fanny, that within a week after her death a number of her papers were destroyed by Fanny. She says it was after the death of Miss Erwin. Another witness has testified as to the destruction of papers before her death. Now, this is not so much a question of the importance of the papers as what the act in itself means. To attempt to decide as to whether or not certain papers relating to business transactions were ones which ought to be destroyed is the act rather of one who is a mistress than one who is a servant.

VOL. CLXXXVI—21

" In considering the testimony of Fanny, and it is important to look at all of it, because with Mr. Tindall's testimony and Fanny's testimony we get close to the transaction which is under investigation, it appeared to me that she told very intelligently and very carefully, I might say even accurately, what had occurred within her knowledge, except as to one matter. She was asked upon cross-examination as to whether or not Miss Erwin was not in the habit of keeping considerable sums of money in her bureau drawer. Fanny said that she did not know about it. That is a fact which would not be likely to be forgotten, one which would be likely to impress a person occupying that relation if she knew it. Later in her examination, when she told about the Christmas presents, she said that she got the gold pieces, five, ten and twenty dollar gold pieces, out of a bag kept in the bureau drawer. Mary Moore testified that when she got her $1,000 Fanny went to the bureau drawer and got it out. Fanny herself tells us that she got $10.00 from the bag for the fireman who came there to get some money as a contribution, and Mr. Henderson tells us that in his presence she counted out $100 to a person who came there for Mrs. Grider. This latter item of testimony is denied by both Fanny and Mrs. Grider. It did appear, however, from Mrs. Grider's testimony, that she had been in the habit of borrowing money from Miss Erwin, and at their last interview Miss Erwin forgave it.

I have just one other item of testimony to which I will call your attention in this aspect of the case, and that was the evidence of James H. Taylor. He testified to the strongest expression on the part of Miss Erwin with respect to Mrs. Agnew that appears in this cause so far as I remember. There was a mortgage upon this house, and he concluded that it was not worth while to pay off that mortgage, and expressed a willingness to transfer the house. Mr. Tindall told him that the mortgage belonged to Mrs. Agnew. It appears that Dr. Erwin Agnew had told him that the mortgage belonged to Miss Erwin. He made the transfer to Mrs. Agnew at Mr. Tindall's suggestion. After that he went to Miss Erwin and he told Miss Erwin that Mrs. Agnew had got this property which belonged to her, Miss Erwin. Then he says Miss Erwin said : " She will not make anything by that." Now that is the strongest expression of a purpose antagonistic to Mrs. Agnew that I recall in

the case. But as you see, with respect to that matter, Mrs. Agnew was entirely innocent. The suggestion of the transfer of this real estate was not made by her, but was determined by Mr. Tindall. Now, why was it, there apparently being some question about it, that Mr. Tindall did not go to Miss Erwin and get what knowledge she may have had with respect to that property before it was done? He testifies that he explained it to her afterwards and that she was satisfied, but the transfer was made at the suggestion of Mr. Tindall. Now it appears Mr. Taylor thought that had an influence upon Miss Erwin, because he testified that he told Dr. Adams, in the interview that they had, that he knew what had turned Miss Erwin's mind with respect to Mrs. Agnew. Before he went to see Miss Erwin to tell her about this fact he had a consultation with Mr. Tindall, and it further appears in the case that he was in the habit of taking his dinner at this house with these girls.

I have now gone over the facts which have impressed me in the case of the contestant. There is a great deal of general testimony upon the other side which you ought to carefully consider, evidence as to the clearness of mind and purpose on the part of Miss Erwin. She was no relation at all to Mrs. Agnew. Mrs. Agnew had already received, through the death of her husband, a very large estate, the moneys of which had come from the Erwins. The servants who are the objects of these bequests were servants who had gone into the house in childhood, who had waited upon her and attended to her, who were with her through all her times of sorrow and affliction, and according to all of the evidence, they were servants who had attended her faithfully and kindly.

[There is considerable evidence of a want of sympathy on the part of Miss Erwin with respect to Mrs. Agnew. You will recall that testimony and give to it such weight as it deserves. You have the evidence of entirely reputable counsel and able counsel who prepared this will, and the subscribing witnesses who were present when it was executed, that Miss Erwin went over the details of it, exhibiting a thorough understanding and comprehension of them, and that it indicated the purposes which she had in mind and carried them into effect. There are some specific items of testimony on this side of the case to which I want to call your attention, and the first is to the miniature

about which we have heard so much discussion. It appears this was a miniature of Miss Erwin's father, Robert Erwin. It had belonged to her sister Mary, and Mary's direction with respect to it was that it should be buried with her. However, Dr. Erwin got it and put it in his safe and determined to give it to his stepdaughter, Susie. Susie, doubtless, as she tells us, with the idea of asserting her title to it when Miss Erwin asked for it, took it down to Caldwell's and had the inscription put on it as coming from Dr. Erwin, calling him her father, to herself, and then she took it to Miss Erwin. Now Miss Erwin, whether through Fanny or by her own exertions, had that inscription removed, thus meeting the claim of property which Susie made, and she handed it over to her cousin, Mr. Parsons. Although this miniature has perhaps little pecuniary value, it has a value of another kind. Miss Erwin might well say that this was a matter of family interest. It was the portrait of her father, and it belonged to her sister, and her view might well be that that was not to go to some person who was not related by family ties, but ought to go to some one within the family, and, at all events, it seems to me to be quite plain that she intended to indicate at that time that that property was not to go back to Susie, but that she was there asserting her right to it, and a right to determine it.] [15]

[It also appears, with respect to the Bail and Tioga rents, that these rents had been sent to Mrs. Agnew in the spring, according to her own testimony, and that Miss Erwin's share of them was not paid over to her by Mrs. Agnew until in November of 1893, and after Miss Erwin had called Mrs. Agnew's attention to the fact that they were unpaid. Now here was a matter of substance. It was a question of moneys collected, and it is one to which a person might well give importance.] [16]

[There is also the fact, endeavoring to account for a change of attitude upon the part of Miss Erwin, of the sale by Mrs. Agnew of her home upon Arch street. You will remember the testimony that, after the death of Dr. Agnew, Miss Erwin suggested that now they were all in all to each other, and they ought to come together and live close to each other, as apparently they did, and it would seem from what Miss Erwin said to Mrs. Agnew, as testified to by Mrs. Agnew, that while she thought it would be well for Mrs. Agnew to take a smaller

house, her idea was that Mrs. Agnew would take a house upon Arch street or upon Broad street. Instead of doing so, acting upon her own judgment and following her own tastes, no doubt, she bought the property 1910 Locust street. Now the question for you to consider is whether or not Miss Erwin may not have considered that the initial step in the way of separation of their attachments was taken by Mrs. Agnew. If it be true, as testified, and I do not know that there was any contradiction of it, Miss Erwin had given for the purchase of this house on Arch street $30,000 of her own money, and now if the sale, or attempted sale, of this property, and the getting of a home in some other and more fashionable locality, involved a loss of money, part of which had been contributed to this large extent by Miss Erwin, it would seem not only to be a reason which might have influenced her, but one which might properly influence her in coming to a determination.] [17]

I have now gone over the case upon its facts as fully as I care to do with you. [It is not for me to present to you the details of testimony, nor is it for me to find questions of fact. That is exclusively your province. You will take them all into consideration and endeavor to reach a correct conclusion upon the one question which is presented to you, was this the will of Miss Erwin? No matter how remarkable or how strange it may appear to you, in what was done in it, does it represent her purposes and her intentions? Or was it not the will of Miss Erwin, but a will brought about by improper influence of those who surrounded her? And does it represent their wishes and their intentions rather than hers? In other words, did they exert undue influence upon her, and thus produce the result which we have before us?] [18]

Verdict and judgment for plaintiffs. Defendant appealed.

*Errors assigned* among others were (7, 15–18) above instructions, quoting them.

*M. Hampton Todd,* for appellant.—The burden of proof having been cast upon and accepted by the plaintiffs to show the absence of undue influence in the execution of the will in controversy, the evidence produced was not sufficient to rebut the presumption of undue influence, and the question should not have

been submitted to the jury, but the court on this issue should have given a binding instruction to the jury to find for the defendant: Darlington's Est., 147 Pa. 624 ; Wilson v. Mitchell, 101 Pa. 495 ; Armor's Est., 154 Pa. 517 ; Herster v. Herster, 122 Pa. 239 ; Yardley v. Cuthbertson, 108 Pa. 395 ; Greenfield's Est., 14 Pa. 489 ; Baker v. Batt, 2 Moore, P. C. 317 ; Patton v. Williams, 2 Curt. 530 ; Harwood v. Baker, 3 Moore, P. C. 282 ; Lucas v. Parsons, 27 Ga. 593 ; Watterson v. Watterson, 1 Head, 1 ; Tyler v. Gardiner, 35 N. Y. 559 ; Browning v. Budd, 6 Moore, P. C. 430 ; Delafield v. Parish, 25 N. Y. 9 ; 1 Williams on Executors, 63 ; Schouler on Wills, sec. 234 ; Huguenin v. Basely, 14 Ves. 273 ; 1 Redfield on Wills, sec. 38, pl. 19 ; Irwin v. Keen, 3 Wharton, 347 ; Miskey's App., 107 Pa. 611 ; Scheetz's App., 35 Pa. 88 ; Sharpless's Est., 134 Pa. 250 ; Harrison's App., 100 Pa. 458 ; Pensyl's App., 157 Pa. 465 ; Cauffman v. Long, 82 Pa. 72 ; Hoopes's Est., 174 Pa. 373.

The court erred in giving binding instructions to the jury to find for the plaintiff on the issue of testamentary capacity, and under any circumstances should have accompanied the same with instructions on the rule of law governing bequests in favor of those in confidential relations to the testator, who write or procure a will to be written, where the mental faculties of such testator are impaired by great age or other cause, although not to the point of lacking testamentary capacity, and not having done so, the charge in this particular was inadequate.

*John G. Johnson,* with him *John F. Lewis,* for appellees, cited Gibbs v. Daniel, 4 Giffard, 1.

OPINION BY MR. JUSTICE FELL, May 26, 1898 :

The argument of the appellant is mainly directed to show that the evidence produced by the plaintiffs at the trial was insufficient to rebut the presumption of undue influence, and that on this issue the court should have given binding instructions for the defendant. The plaintiffs assumed the burden of establishing the absence of undue influence, and the testimony produced was of such a character as clearly to require its submission to the jury. There was nothing immediately connected with the preparation of the will or with its execution which would indicate that the mind of the testatrix had been influenced by

any one. The will was drafted by counsel of the highest character in pursuance of directions given to him personally by the testatrix. It was sent to her by mail, and after it had been in her possession more than a day it was signed by her in the presence of most reputable witnesses. Neither of these persons took anything by the will, and no one interested in it was present when the directions for its preparation were given, or when it was signed. There is nothing in the provisions of the will which in itself would indicate that the mind of the testatrix was under constraint. The provisions are unusual, but they are not more so than the circumstances which surrounded the testatrix. She was a woman of advanced age, the survivor of a family of five sisters. Her nearest relatives were second cousins, with whom she was not on terms of intimacy. The line on which the estate had descended ended with her. Most of those who benefited by her will had peculiar claims on her bounty. Her servants had entered her house as children, two of them twenty-three years and one thirty years before. They had been treated as members of the family, and they had attended her with unusual kindness and fidelity. Before making her last will she had frequently declared her intention to change her then existing will; after she had made it she expressed her satisfaction that she had done so. Considering these facts only we find nothing which suggests that the will of 1893 is not the deliberate, well-considered and uninfluenced act of the testatrix in disposing of her estate.

The facts which throw doubt upon the subject, and which shifted the burden of proof as to undue influence are these: under the will of 1891 Mrs. Agnew, the contestant, was the residuary legatee, and Mr. Tindall, who was the attorney and confidential adviser of Mrs. Erwin, took nothing. Under the will of 1893 Mrs. Agnew takes nothing and Mr. Tindall is largely benefited. It cannot be said that either of these persons had a claim upon the bounty of Mrs. Erwin. Neither was of her blood, and she owed no duty to either. Mrs. Agnew had married Miss Erwin's nephew, and by his death had come into possession of $400,000 of the family estate. Mr. Tindall had been fully paid for his services and had in addition received large gifts.

The real question at the trial was whether undue influence

had been exerted which was a present constraint upon the mind of the testatrix when she made her will, although not apparent to those who were then brought into relations with her in its preparation and execution. This question opened a wide field for controversy, but we are now concerned only to know whether it was for the jury or for the court. That it was for the former seems too clear to admit of doubt. The decision of this question depended mainly on inferences to be drawn from facts which were to be ascertained from conflicting testimony. Neither the ascertainment of the facts nor the inferences to be drawn from them was for the court. The question was submitted to the jury with the most careful and guarded instructions. It was said by the learned judge in the general charge: " Whenever one occupying a confidential relation to a testator writes or procures to be written the will of such testator, and thereunder takes a substantial legacy, and the mental faculties of such testator were at the time of making such will, by reason of great sorrow, advanced age or ill health impaired, although not to the point of lacking testamentary capacity, there is a presumption of fact that undue influence was brought to bear on the mind of the testator in the execution of the will, and the burden is on the beneficiary to rebut this presumption. . . . Undue influence exists wherever through weakness, dependence or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the former from exercising an unbiased judgment. . . . Where a confidential relation exists, the party in whom confidence is placed is held to the strictest accountability, and the burden is upon him to show that a transaction between himself and his principal by which he derives a benefit was fair and conscientious and beyond the reach of suspicion."

The law applicable to the case and the questions of fact to be considered by the jury were fully and clearly stated in the charge, and whatever doubt may have existed on the subject of undue influence must now be considered as settled by the verdict. No useful purpose would be served by entering upon an extended review of the testimony bearing on this and other questions. We find no error in the rulings or in the charge.

The judgment is affirmed.